IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| Lionel White, | ) |
| | ) |
| *Plaintiff* | ) |
| | ) No. _____ |
| *-vs-* | ) |
| | ) *(Jury Demand)* |
| City of Chicago, Ronald Watts, | ) |
| Phillip Cline, Debra Kirby, Alvin | ) |
| Jones, Elsworth Smith, Jr., Kallatt | ) |
| Mohammed, Manuel Leano, Brian | ) |
| Bolton, Robert Gonzalez, and | ) |
| Douglas Nichols, | ) |
| | ) |
| *Defendants* | ) |

## COMPLAINT

Plaintiff, by counsel, alleges as follows:

### I. Introduction

1. Plaintiff Lionel White is one of many victims of the criminal enterprise run by convicted felon and former Chicago Police Sergeant Ronald Watts and his tactical team at the Ida B. Wells Homes in the 2000's.

2. The Watts Gang of officers engaged in robbery, extortion, the use of excessive force, planting evidence, fabricating evidence, and manufacturing false charges.

3. High ranking officials within the Chicago Police Department were aware of the Watts Gang's criminal enterprise, but failed to take any action to stop it.

4. The Chicago Police Department's official policies or customs of failing to discipline, supervise, and control its officers and of a "code of silence" were a proximate cause of the Watts Gang's criminal enterprise.

5. White was one person harmed; Watts Gang officers subjected White to excessive force, arrested him without probable cause, fabricated evidence against him, and framed him for drug possession, a charge for which he served two years in prison.

6. Based on the powerful evidence that has come to light about the Watts Gang's nearly decade-long criminal enterprise, on December 14, 2016, the Circuit Court of Cook County granted White's motion to vacate his conviction and on January 5, 2017, the Circuit Court of Cook County granted White a certificate of innocence.

7. White brings this lawsuit to secure a remedy for his illegal incarceration, which was caused by the Watts Gang, by the failure of high-ranking officials within the Chicago Police Department to stop the Watts Gang, by the code of silence within the Chicago Police Department, and by the Chicago Police Department's defective discipline policy.

## II. Parties and Jurisdiction

8. This is a civil action arising under 42 U.S.C. § 1983. The jurisdiction of this Court is invoked pursuant to 28 U.S.C. §§ 1343 and 1367.

9. Plaintiff Lionel White is a resident of the Northern District of Illinois.

10. Defendant City of Chicago is an Illinois municipal corporation.

11. Defendants Ronald Watts, Alvin Jones, Elsworth Smith, Jr., Kallatt Mohammed, Manual Leano, Brian Bolton, Robert Gonzalez, and Douglas Nichols (hereinafter "individual officer defendants") were at all relevant times acting under color of their offices as Chicago police officers.

12. Defendant Philip Cline was at all relevant times Superintendent of the Chicago Police Department. Plaintiff sues Cline in his individual capacity.

13. Defendant Debra Kirby was at all relevant times the Assistant Deputy Superintendent of the Chicago Police Department, acting as head of the Chicago Police Department Internal Affairs Division. Plaintiff sues Kirby in her individual capacity.

### III. False Arrest and Illegal Prosecution of White

14. In April 2006, plaintiff was living in an apartment with his girlfriend, Kimberly Collins, in the Ida B. Wells Homes.

15. On April 24, 2006, plaintiff was home alone when he heard a knock at the door.

16. Plaintiff opened the door to defendants Watts and Jones.

17. As plaintiff opened the door, defendant Jones struck him in the face.

18. Jones stated in substance, "If we find one bag, we putting that bitch out."

19. Plaintiff knew that Jones's statement meant that if the officers claimed to have found any drugs in the apartment, they would cause Collins to be evicted.

20. Plaintiff ran to the window and screamed for help while the officers searched the apartment.

21. Watts and Jones grabbed plaintiff away from the window and beat him again.

22. There were no drugs in the apartment or on plaintiff's person and neither Watts nor Jones found any drugs in the apartment or within plaintiff's possession or control.

23. After their search of the apartment failed to turn up any evidence of a crime, Watts and Jones placed plaintiff in handcuffs and transported him to the police station.

24. At the time of plaintiff's arrest:

    a. Neither Watts nor Jones had a warrant authorizing their entry into the dwelling;

    b.  Neither Watts nor Jones had any lawful basis for entering the dwelling;

    c.  Neither Watts nor Jones had a warrant authorizing the arrest of plaintiff and neither believed that a warrant had been issued authorizing the arrest of plaintiff;

    d.  Neither Watts nor Jones had observed plaintiff commit any offense; and

    e.  Neither Watts nor Jones had received information from any source that plaintiff had committed an offense.

25. Officers later took plaintiff to a hospital to receive treatment for the injuries inflicted by defendants Watts and Jones.

26. Shortly after Watts and Jones arrested plaintiff, the individual officer defendants conspired, confederated, and agreed to fabricate a false story in an attempt to justify the unlawful arrest, to cover-up their wrongdoing, and to cause plaintiff to be wrongfully detained and prosecuted.

27. The false story fabricated by the officers consisted of the following prevarications:

    a.  Defendant Jones falsely claimed that he had seen plaintiff in a public area of the apartment building holding a plastic bag containing drugs;

b. Jones falsely claimed that he had announced that he was a police officer and plaintiff attempted to run away;

c. Jones falsely claimed that he had chased plaintiff and the two had scuffled;

d. Jones falsely claimed that plaintiff swung twice at Jones before Jones "gave the subject several elbow strikes until he was subdued;" and

e. Jones falsely claimed that he recovered a bag from plaintiff that contained 100 smaller bags of heroin.

28. The acts of the individual officer defendants in furtherance of their scheme to frame plaintiff included the following:

a. One or more of the individual officer defendants prepared police reports containing the false story, and the other individual officer defendants each failed to intervene to prevent the violation of plaintiff's rights;

b. One or more of the individual officer defendants attested through the official police reports that they were witnesses to the false story, and the other individual officer defendants each failed to intervene to prevent the violation of plaintiff's rights;

c.  Defendant Watts formally approved the official police reports despite knowing that they contained the false story; and

d.  One or more of the individual officer defendants communicated the false story to prosecutors, and the other individual officer defendants each failed to intervene to prevent the violation of plaintiff's rights.

29.  Each of the individual officer defendants' wrongful acts was performed with knowledge that the acts would cause plaintiff to be wrongfully held in custody and falsely prosecuted for an offense that had never occurred.

30.  As a result of the individual officer defendants' wrongful acts, plaintiff was charged with several narcotics offenses, one of which was punishable under Illinois law as a "Class X" offense.

31.  Plaintiff knew that he would receive a life sentence if convicted of the Class X offense.

32.  Plaintiff also knew that proving that the individual officer defendants had concocted the charges against him would not be possible.

33.  Accordingly, on June 26, 2006, plaintiff accepted a plea offer to reduce the charges in exchange for a five-year sentence.

34.  Plaintiff pleaded guilty even though he was innocent.

35. Plaintiff stated in open court during his plea hearing:

The officers that did this to me, I was in my house. This is wrong and I'm scared to take my chances. When they was in my house beating me, I went to the window to holler out for help and the police came over and showed the time they say I did this.

They was (sic) in my house beating me and I went to the hospital, your Honor. This is wrong. I am pleading guilty because I am scared. That's the honest to God truth, your Honor. I lost my momma, my daddy, my grandma, my auntie. I lost most of my family during all this time I have done. I don't have no problem if I done it, I will do the time. But I am scared. That's why I am taking the time, your Honor.

Police came to my fiancée house and the time I came in two places at one time, your Honor, people beat me and put me in the hospital.

36. As a result of the above-described wrongful acts of the individual officer defendants, plaintiff was deprived of his liberty during his incarceration.

37. Plaintiff was continuously in custody from his arrest on April 24, 2006 until his release from the Illinois Department of Corrections on April 22, 2008.

38. Plaintiff sought to vacate his conviction after he learned that federal prosecutors and lawyers for other wrongfully convicted individuals had uncovered evidence of the Watts Gang's criminal enterprise.

39. The State agreed to plaintiff's motion to vacate his conviction.

40. On December 14, 2016, the Circuit Court of Cook County granted plaintiff's motion to vacate his conviction.

41. On January 5, 2017, the Circuit Court of Cook County granted plaintiff a certificate of innocence.

### IV. White's Arrest and Prosecution Were Part of a Long-Running Pattern Known to High Ranking Officials within the Chicago Police Department

42. Before the Watts Gang engineered plaintiff's above-described wrongful arrest, detention, and prosecution, the Chicago Police Department had received numerous civilian complaints that defendant Watts and the Watts Gang were engaging in robbery, extortion, the use of excessive force, planting evidence, fabricating evidence, and manufacturing false charges against persons at the Ida B. Wells Homes.

43. These civilian complaints were corroborated by information criminal investigators obtained from multiple cooperating witnesses.

44. Before the Watts Gang engineered plaintiff's above-described wrongful arrest, detention, and prosecution, defendants Cline and Kirby knew about the above-described credible allegations of serious wrongdoing by Watts and the Watts Gang.

45. Defendants Cline and Kirby also knew, before the Watts Gang engineered plaintiff's above-described wrongful arrest, detention, and prosecution, that, absent intervention by the Chicago Police Department, Watts and his gang would continue to engage in robbery, extortion, the use of

excessive force, planting evidence, fabricating evidence, and manufacturing false charges.

46. The Internal Affairs Division of the Chicago Police knew about the lawlessness of Watts and his gang in 2004 or earlier.

47. Defendants Cline and Kirby had the power and the opportunity to prevent Watts and his gang from continuing to engage in the above-described wrongdoing.

48. Defendants Cline and Kirby deliberately chose to turn a blind eye to the pattern of wrongdoing by Watts and his gang.

49. As a direct and proximate result of the deliberate indifference of defendants Cline and Kirby, Watts and his gang continued to engage in robbery, extortion, the use of excessive force, planting evidence, fabricating evidence, and manufacturing false charges against persons at the Ida B. Wells Homes, including but not limited to the wrongful arrest, detention, and prosecution of plaintiff, as described above.

**V. Official Policies and Customs of the Chicago Police Department Were the Moving Force behind the Defendants' Misconduct**

50. At all relevant times, the Chicago Police Department maintained official policies and customs that facilitated and condoned the Defendants' misconduct.

### A. Failure to Discipline

51. At all relevant times, the Chicago Police Department maintained a policy or custom of failing to discipline, supervise, and control its officers. By maintaining this policy or custom, the City caused its officers to believe that they could engage in misconduct with impunity because their actions would never be thoroughly scrutinized.

52. Before plaintiff's arrest, policymakers for the City of Chicago knew that the Chicago Police Department's policies or customs for disciplining, supervising, and controlling its officers were inadequate and caused police misconduct.

53. Despite their knowledge of the City's failed policies and customs for disciplining, supervising, and controlling its officers, the policymakers failed to take action to remedy these problems.

54. Before the Watts Gang engineered plaintiff's above-described wrongful arrest, detention, and prosecution, each of the individual officer defendants had been the subject of ten or more formal complaints of official misconduct.

55. As a direct and proximate result of the Chicago Police Department's inadequate policies or customs for disciplining, supervising, and controlling its officers and the policymakers' failure to address these problems, Watts and his gang continued to engage in robbery, extortion, the

-11-

use of excessive force, planting evidence, fabricating evidence, and manufacturing false charges against persons at the Ida B. Wells Homes, including but not limited to the wrongful arrest, detention, and prosecution of plaintiff, as described above.

### B. Code of Silence

56. At all relevant times, the Chicago Police Department maintained a "code of silence" that required police officers to remain silent about police misconduct. An officer who violated the code of silence would be severely penalized by the Department.

57. Police officers are trained at the Chicago Police Academy not to break the code of silence. Officers are instructed that "Blue is Blue. You stick together. If something occurs on the street that you don't think is proper, you go with the flow. And after that situation, if you have an issue with that officer or what happened, you can confront them. If you don't feel comfortable working with them anymore, you can go to the watch commander and request a new partner. But you never break the code of silence."

58. This "code of silence" facilitated, encouraged, and enabled the individual officer defendants to engage in egregious misconduct for many years, knowing that their fellow officers would cover for them and help conceal their widespread wrongdoing.

59. Consistent with this "code of silence," the few people within the Chicago Police Department who stood up to Watts and his gang or who attempted to report their misconduct were either ignored or punished, and the Watts Gang was able to engage in misconduct with impunity.

60. Watts and his gang are not the first Chicago police officers who were allowed to abuse citizens with impunity over a period of years while the City turned a blind eye.

61. One example of this widespread practice is Chicago police officer Jerome Finnigan, who was convicted and sentenced on federal criminal charges in 2011. One of the charges against Finnigan involved his attempt to hire a hitman to kill a police officer whom Finnigan believed would be a witness against him.

62. Finnigan was part of a group of officers in the Defendant City's Special Operations Section who carried out robberies, home invasions, unlawful searches and seizures, and other crimes.

63. Finnigan and his crew engaged in their misconduct at around the same time that plaintiff was subjected to the abuses described above.

64. Finnigan, like the individual officer defendants in this case, had been the subject of many formal complaints of misconduct.

65.    Finnigan revealed at his criminal sentencing hearing in 2011, "You know, my bosses knew what I was doing out there, and it went on and on. And this wasn't the exception to the rule. This was the rule."

66.    Defendants Watts and Mohammed were criminally charged in federal court in February 2012 after shaking down a federal informant they believed was a drug dealer.

67.    Defendant Mohammed pleaded guilty in 2012.

68.    Defendant Watts pleaded guilty in 2013.

69.    In the case of *Obrycka v. City of Chicago et al.*, No. 07-cv-2372 (N.D. Ill.), a federal jury found that as of February 2007 "the City [of Chicago] had a widespread custom and/or practice of failing to investigate and/or discipline its officers and/or code of silence."

70.    In December 2015, Chicago Mayor Rahm Emanuel acknowledged the continued existence of the code of silence within the Chicago Police Department; Emanuel, speaking in his capacity as Mayor, admitted that the code of silence leads to a culture where extreme acts of abuse are tolerated.

71.    In April 2016, the City's Police Accountability Task Force found that the code of silence "is institutionalized and reinforced by CPD rules and

policies that are also baked into the labor agreements between the various police unions and the City."

72. In an official government report issued in January 2017, the United States Department of Justice found that "a code of silence exists, and officers and community members know it."

73. The same code of silence in place during the time period at issue in the *Obrycka* case and recognized by the Mayor, the Task Force, and the Department of Justice was also in place when plaintiff suffered the wrongful arrest, detention, and prosecution, as described above.

74. As a direct and proximate result of the City's code of silence, Watts and his gang continued to engage in robbery, extortion, the use of excessive force, planting evidence, fabricating evidence, and manufacturing false charges against persons at the Ida B. Wells Homes, including but not limited to the wrongful arrest, detention, and prosecution of plaintiff, as described above.

## VI. Claims

75. As a result of the foregoing, all of the defendants caused plaintiff to be deprived of rights secured by the Fourth and Fourteenth Amendments.

76. As a supplemental state law claim against defendant City of Chicago only: as a result of the foregoing, plaintiff was subjected to a malicious prosecution under Illinois law.

77.     Plaintiff hereby demands trial by jury.

WHEREFORE plaintiff requests that appropriate compensatory and punitive damages be awarded against the individual defendants and that appropriate compensatory damages only be awarded against defendant City of Chicago, and that the Court award fees and costs against defendants.

Respectfully submitted,

/s/   Joel A. Flaxman
      Joel A. Flaxman
      ARDC No. 6292818
      Kenneth N. Flaxman
      KENNETH N. FLAXMAN P.C.
      200 S Michigan Ave Ste 201
      Chicago, IL 60604-2430
      O: 312.427.3200
      F: 312.427.3930
      jaf@kenlaw.com

/s/   Elizabeth Mazur
      Elizabeth Mazur
      Jon Loevy
      LOEVY & LOEVY
      311 N. Aberdeen St., 3rd Fl.
      Chicago, IL 60607
      O: 312.243.5900
      F: 312.243.5902
      elizabethm@loevy.com

      Elizabeth Wang
      LOEVY & LOEVY
      2060 Broadway, Suite 460
      Boulder, CO 80302
      O: 720.328.5642
      F: 312.243.5902


      *Attorneys for plaintiff*